CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED
February 28, 2025
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **TELLY SAVALAS BRISTOL,** )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>**NURSE PRACTITIONER OLINGER,** )<br>    Defendant. )<br>) | Case No. 7:22cv00603<br><br>**MEMORANDUM OPINION**<br><br>By: Pamela Meade Sargent<br>United States Magistrate Judge |

The plaintiff, Telly Savalas Bristol, ("Bristol"), an unrepresented Virginia inmate, filed this action under 42 U.S.C. § 1983, alleging that he received inappropriate mental health care at River North Correctional Center, ("River North"). The only claims remaining before the court assert that the defendant, Olinger, a nurse practitioner, ("N.P.") discontinued Bristol's mental health medications in retaliation for comments he made to her.[1] After review of the record, the court concludes that the defendant is entitled to summary judgment as a matter of law.

I.     Background

In 2022, Bristol was confined at River North, a prison operated by the Virginia Department of Corrections, ("VDOC"). His § 1983 Amended Complaint, (Docket Item No. 41) ("Complaint"), alleges that staff did not ensure that he received adequate mental health treatment. The defendants filed a Motion to Dismiss, and Bristol responded. (Docket Item Nos. 46, 53.) In deciding this motion, the court

---

[1] Bristol is now incarcerated at a different state prison facility. (Docket Item No. 57).

carefully construed the factual scenario provided, piecemeal, by Bristol's submissions. *Bristol v. Anderson*, No. 7:22cv00603, 2024 WL 1020578, at *3 (W.D. Va. Mar. 8, 2024), *appeal dismissed*, No. 24-6322, 2024 WL 4523812 (4th Cir. June 25, 2024) ("*Bristol I*"). "On July 21, 2022, NP Olinger met with Bristol via telemedicine to evaluate his psychiatric needs." *Bristol I* at *3. Bristol complained that his medications were not working and that he should have a different housing assignment because of his mental health. *Bristol I* at *3. Bristol alleges:

> NP Olinger "got mad and as a result of the argument . . . she threatened to take [Bristol] off [his] meds. [Bristol] told her she couldn't, [and] she then stated 'that [he] need[ed] to be careful what [he] ask[ed] for.'"[2]
>
> Bristol wrote to Spangler[3] on August 7, 2022, asking why NP Olinger had taken Bristol off his mental health medications. Spangler responded that Bristol had refused to sign a consent form. Bristol claims he would have signed the form if not for the argument he had had with NP Olinger on July 21, 2022. He states that he did not give NP Olinger permission to discontinue any medications. He also asserts that she did not "attempt[t] to step [him] down. She just discontinued them. Spangler also told Bristol that NP Olinger discontinued his medications (Atarax, Paxil, and Remeron) because Bristol had showed only symptoms of Antisocial Personality Disorder. Another medication, Buspar, was not discontinued.

*Bristol I* at *3. The court granted, in part, the defendants' Motion to Dismiss, leaving only Bristol's claims of retaliation and deliberate indifference by Olinger to be decided. *Bristol I* at *8. The court directed defendant Olinger to file an Answer and

---

[2] The court has omitted internal citations here and throughout this Memorandum Opinion, unless otherwise noted.

[3] Prior defendant Spangler, "M. ED Resident in Counseling," was present during this consultation between N.P. Olinger and Bristol. (Docket Item No. 41.)

any summary judgment motion within 28 days. She did so. Her summary judgment motion argues that Bristol failed to exhaust administrative remedies before filing this lawsuit and, in the alternative, that she was not deliberately indifferent to Bristol's serious mental health needs and did not retaliate against him. Bristol has responded to the motion.[4]

## I. DISCUSSION

### A. Standards of Review

The Federal Rules of Civil Procedure provide that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(a). In considering a motion for summary judgment, the court must view the facts and justifiable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312-13 (4th Cir. 2013). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[4] Olinger filed her summary judgment motion in April 2024, and Bristol filed his response later that month. He did not file any motion seeking to compel discovery responses or offer the court any indication that he had served any discovery requests on the defendant, either before or after she filed her motion. In his response to the motion, he asserts that the court cannot grant summary judgment because he must have time to engage in discovery. (Docket Item No. 71, at 4.) However, he does not indicate any specific evidence that he has sought or would seek through discovery relevant to his ability to respond to that motion. Therefore, the court considers the motion to be ripe for decision, with no further time granted for unspecified discovery.

Furthermore, the court is required to liberally construe complaints filed by plaintiffs proceeding pro se. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pro se complaints are held to a less stringent standard than those drafted by attorneys. See *Erickson*, 551 U.S. at 94; *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). This requirement of liberal construction does not mean, however, that the court should ignore a clear failure to plead facts that set forth a cognizable claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

Under 42 U.S.C. § 1997e(a), a prisoner cannot bring a civil action concerning prison conditions until he has first exhausted his available administrative remedies. This exhaustion requirement is "mandatory," *Ross v. Blake*, 578 U.S. 632, 638 (2016), and "applies to all inmate suits about prison life." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). To comply with § 1997e(a), an inmate must follow each step of the established grievance procedure that the prison facility provides to its inmates and meet all deadlines within that procedure. *See Woodford v. Ngo*, 548 U.S. 81, 90-94 (2006). Even if the form of relief the inmate seeks in his lawsuit is not available through the prison's grievance proceedings, he must, nevertheless, properly exhaust all available remedies under that procedure before bringing a civil action in this court. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

> Although the PLRA's exhaustion requirement is "strict," it "does not operate as an absolute bar to prison litigation in federal court." *Griffin v. Bryant*, 56 F.4th 328, 335 (4th Cir. 2022). Instead, "it sets forth a built-in exception, specifying that a prisoner need not exhaust remedies if they are not available." [*Griffin*, 56 F.4th at 335] (citing *Ross* [578 U.S. at 635–36]). In other words, if "an administrative remedy, although officially on the books, is not capable of use to obtain relief," the exhaustion requirement "does not come into play." *Ross*, 578 U.S. at 643, 136 S. Ct. 1850. The Supreme Court has identified three circumstances that satisfy this standard: (1) where the

administrative remedy "operates as a simple dead end," with prison officials "unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque" that it is "practically . . . incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) where "prison administrators thwart inmates from taking advantage of a grievance procedure through machination, misrepresentation, or intimidation." [*Ross,* 578 U.S. at] at 643–44, 136 S.Ct. 1850; *see also Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) ("[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it.").

*Clem v. Hamilton*, No. 7:23cv00487, 2024 WL 2869038, at *2 (W.D. Va. June 6, 2024).

B.  VDOC Grievance Procedures.

Operating Procedure, ("OP"), 866.1 is the written administrative remedies procedure that VDOC inmates must follow to comply with § 1997e(a). (Mem. Supp. Summ. J., Ex. 2, Sutfin Decl. and Enclosure A, Docket Item No. 61-2.)  All issues are grievable except disciplinary proceedings and matters outside the control of the VDOC.  Under OP 866.1, an inmate with a grievance about some event or issue must first make a good faith effort to resolve his concerns informally, which he may do by completing an Informal/Written Complaint form[5] within 15 days of the incident and submitting it to prison staff.  The inmate should receive a written response on the bottom of the form within 15 days, to allow him to initiate the formal grievance procedure by filing a Regular Grievance, with the Informal/Written Complaint form or any other relevant documentation attached.  The filing of an Informal/Written

---

[5] OP 866.1 refers to this stage of the procedure as the Informal Complaint Process. Therefore, the court will refer to the filing as an Informal/Written Complaint.  This informal portion of the grievance process also includes making a verbal complaint that is not at issue in this case.

Complaint does not satisfy the exhaustion requirement under § 1997e(a).  If the inmate is dissatisfied with the staff response to the Informal/ Written Complaint, or fifteen days have passed without a staff response, the inmate may submit a Regular Grievance.

A Regular Grievance must be filed within 30 days of the occurrence about which it complains.  It should address only one issue, and if multiple issues are presented, responding officials will address only one issue.  If a Regular Grievance does not comply with the filing requirements of OP 866.1, it will be rejected at intake and returned to the inmate within two working days from the date of receipt.  The respondent will note on the back of the form the reason for rejection and how to remedy any problems, if feasible, so that the inmate can correct the issue and resubmit the Regular Grievance.  If the inmate disagrees with the intake decision, he has five days to appeal that decision to the Regional Ombudsman.  However, such an appeal does not satisfy the exhaustion requirement, because the inmate could resubmit his Regular Grievance with corrections.

Once a Regular Grievance is accepted at intake, the warden or his designee will investigate the complaint it contains and send the inmate a Level I response.  If the responding official determines the grievance to be unfounded, the inmate has five days to submit the Regular Grievance and attachments on appeal to Level II, to an appropriate VDOC official such as the Regional Administrator or other administrator, depending on subject matter.  In most cases, this Level II review is the final available level of appeal.  For full exhaustion, the inmate must submit the claim via an Informal/Written Complaint, then in a Regular Grievance, and then through all levels of appeal available in OP 866.1.

C.  Bristol's Administrative Remedy Records

The River North Grievance Coordinator, S. Sutfin, states that review of Bristol's grievance document file at River North reflects that he did not fully exhaust available remedy procedures as to either of his § 1983 claims. (Docket Item No. 61-2.)  In an Informal/Written Complaint dated August 2, 2022, Bristol complained that during his telemedicine, ("telemed"), visit with the nurse practitioner on July 21, 2022, she "threatened to take [him] off [his] mental health meds." (Docket Item No. 61-2 at 24.)  Bristol further stated that Olinger "told [him he is] gonna get what [he] wish[ed] for" and "took [him] off mental health meds [he had] been taking the past 10 years." (Docket Item No. 61-2 at 24.)  Bristol continued, "So as my meds is decreasing my depression, anxieties, paranoia, sleep, etc. has gotten worser [sic] and I keep an [sic] headache and see thing I never seen before." (Docket Item No. 61-2 at 24.)  In response to this filing, a staff member responded, "Based on your last telepsych appointment on 7/21/2022, the psychiatric provider has discontinued some medications, but continued Buspar.  That is her choice as the licensed provider." (Docket Item No. 61-2 at 24.)

Bristol attached this Informal/Written Complaint to a Regular Grievance form, dated August 19, 2022.  The Regular Grievance repeated the allegations from the earlier filing, but also claimed that Bristol told the provider that she could not just take him off his mental health medications. (Docket Item No. 61-2 at 25.)  It asserted that without the mental health medications, Bristol had headaches, could not sleep well, had lost weight, was having panic attacks, and was "really sick." (Docket Item No. 61-2 at 25.)  Bristol asked to be referred for treatment to an outside psychiatric provider. (Docket Item No. 61-2 at 25.)  The responding official rejected this Regular Grievance on intake, stating that it did not show how Bristol was

-7-

personally affected by the official's actions of which he complained; specifically, the grievance response stated, "You choose to not sign the consent for treatment form" during the July 21, 2022, telepsych visit. (Docket Item No. 61-2 at 26.) Bristol appealed this intake decision, admitting that he had not signed the form required for consent to treatment; his appeal was denied. (Docket Item No. 61-2 at 26, 29.)

Bristol also filed other Informal/Written Complaint forms about Olinger's discontinuation of his medications, but he did not attach these filings to a Regular Grievance form, as the procedure requires. (Docket Item No. 61-2 at 33-34.) In short, Bristol did not file any other Regular Grievance complaining about N.P. Olinger's decisions regarding his mental health treatment. He also did not file any Regular Grievance asserting that Olinger discontinued medications to retaliate against him for comments he made during the July 21, 2022, telemed visit.

Based on the evidence, the court concludes that Bristol has failed to present facts on which he could persuade a factfinder that he exhausted his administrative remedies as to his retaliation claim before filing this lawsuit. It is undisputed that he did not submit any Informal/Written Complaint form or Regular Grievance complaining that N.P. Olinger changed his medication regime to retaliate against him for comments that he made to her on July 21, 2022. Thus, the court concludes that Bristol's retaliation claim against N.P. Olinger is barred under § 1997e(a) for failure to exhaust administrative remedies and must be dismissed with prejudice, as the record indicates no opportunity to exhaust at this time.

Bristol's claim that N.P. Olinger provided inadequate medical care by discontinuing his mental health medications presents different circumstances,

however. On this issue, Bristol followed VDOC procedure by filing a Regular Grievance, with his Informal/Written Complaint attached. The Regular Grievance stated his complaint about the discontinued medications and explained how N.P. Olinger's action had adversely affected his ability to eat and sleep and caused him to suffer sickness, headaches, depression, anxiety, and paranoia. (Docket Item No. 61-2, at 25.) The response to this administrative remedy was: "You must identify how the issue caused personal harm or loss to you, personally." (Docket Item No. 61-2, at 26.) Certainly, the remedy form *did* describe how Bristol believed N.P. Olinger's actions had harmed him. But the staff member responding to the remedy form also reminded Bristol that he had refused to sign a consent to treatment form and, apparently for both of those reasons, rejected intake of his Regular Grievance. The form did not offer any suggestion for Bristol to correct his Regular Grievance to have it accepted and processed. Similarly, the defendant's evidence in this case does not offer any basis on which Bristol could have revised and resubmitted his Regular Grievance about discontinuation of the medications in a way that it would have been accepted and processed. Thus, the court can only conclude that in this instance, given the Regular Grievance response, the "administrative remedy, although officially on the books, [was] not capable of use to obtain relief," *Ross*, 578 U.S. at 643, and, therefore, was unavailable. The court will deny the summary judgment motion as to the deliberate indifference claim on that basis and address that claim on the merits.

### D.  Deliberate Indifference Standard

A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A deliberate

indifference claim consists of two components, objective and subjective." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). First, "[o]bjectively, the inmate's medical condition must be serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Jackson*, 775 F.3d at 178. A prisoner's mental health claims are treated "just as seriously as any physical health claims." *Depaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)). Bristol had been diagnosed with mental health conditions and had been prescribed multiple medications for his mental health needs, so the court concludes that he has presented a genuine issue of material fact as to the seriousness of those needs.

Second, Bristol must allege the subjective aspect of the constitutional standard. An official is deliberately indifferent to an inmate's serious medical needs only when she subjectively "knows of and disregards an excessive risk to inmate health or safety." *Jackson*, 775 F.3d at 178 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The deliberate indifference standard for culpability is higher than mere negligence, and consequently, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. "To show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178.

A prisoner's right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring*, 551 F.2d at 48. A prisoner's mere disagreement with medical personnel

with respect to a course of treatment is insufficient to demonstrate deliberate indifference. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985). To be sufficiently severe to violate the Constitution, the alleged treatment or deprivation of medical care must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (*overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

### E.  Summary Judgment Evidence on Deliberate Indifference

Olinger offers, in support of her summary judgment motion, her affidavit and notes about the July 21, 2022, telemed appointment with Bristol, as well as notes made by Psych Associate Spangler immediately after that visit and notes Olinger made after a follow-up appointment in November 2022. (Docket Item 61-1.) Olinger states that before her visit with Bristol on July 21, 2022, providers had diagnosed him with antisocial personality disorder. (Docket Item 61-1 at 2.) She reports that no medications are specifically approved by the Food and Drug Administration to treat antisocial personality disorder, but medications may be appropriate to treat some symptoms that can occur with the condition, such as anxiety or depression. (Docket Item 61-1 at 3.) She states, however, that use of medications can exacerbate symptoms related to antisocial personality disorder and complicate the patient's clinical presentation. (Docket Item 61-1 at 3.) She also reports that talk therapy may be helpful to a person with this diagnosis, such as learning anger management and other appropriate coping skills. (Docket Item 61-1 at 3.)

On July 21, 2022, Olinger was not present with Bristol, but Spangler was there. (Docket Item 61-1 at 5-7.) Bristol reported that none of his medications were working. (Docket Item 61-1 at 5.) Olinger noted that Bristol became very agitated with her and Spangler. (Docket Item 61-1 at 4.) The agitation persisted such that Spangler went to get a correctional officer out of safety concerns. (Docket Item 61-1 at 6.) The telemed system froze at one point, so Olinger had to log off and then log back in to make sure that Spangler was not in physical danger. (Docket Item 61-1 at 2.)

In Olinger's assessment that day, Bristol's behavior presented primarily with symptoms of antisocial personality disorder and displayed no apparent depressive symptoms or anxiety. (Docket Item 61-1 at 2.) When responding to Olinger's questions about his mental health, Bristol mostly complained that he needed more medications, but he was unable to vocalize the symptoms he had been experiencing. (Docket Item 61-1 at 2.)

Prior to this appointment, providers also had diagnosed Bristol with generalized anxiety disorder. (Docket Item 61-1 at 2.) During Olinger's assessment on this occasion, she concluded that he did not meet the diagnostic criteria for generalized anxiety disorder. (Docket Item 61-1 at 2.) She noted Bristol's report that his sleep and appetite were fine, and that he did not report neurovegetative symptoms that would indicate underlying issues such as a depressive disorder or an anxiety disorder. (Docket Item 61-1 at 2.)

After Olinger's assessment of Bristol, she encouraged him to use appropriate coping skills when he became irritable. (Docket Item 61-1 at 3.) Olinger noted that most of Bristol's medications did not appear clinically indicated for his current

presentation of primarily antisocial personality disorder, rather than depression or anxiety. (Docket Item 61-1 at 3.) She also had concerns about his polypharmacy, drug-seeking behavior and poor coping skills. (Docket Item 61-1 at 3.) Therefore, Olinger discontinued Atarax, a medication that can be used for symptoms of anxiety and does not require tapering. (Docket Item 61-1 at 3.) She also ordered discontinuation of Remeron and Paxil, medications used to treat depression, by reducing Bristol's doses over a two- to three-week period. (Docket Item 61-1 at 3.) Olinger did not immediately discontinue Buspar, because it is indicated as helpful for agitation, which Bristol had displayed during the appointment. (Docket Item 61-1 at 4.) Bristol refused to sign the medical consent form to be treated with medication, but Olinger nevertheless felt it was in the best interest of Bristol and staff for him to continue Buspar. (Docket Item 61-1 at 4.) This medication was discontinued the next month after Bristol continued to refuse to sign the consent form. (Docket Item 61-1 at 4.)

After the July 21, 2022, appointment, Olinger noted that Bristol should have a follow-up appointment in 90 days or as needed. (Docket Item 61-1 at 4.) The psych associate, not the nurse practitioner, schedules follow-up visits. (Docket Item 61-1 at 4.) Olinger next assessed Bristol via telemed on November 20, 2022. (Docket Item 61-1 at 4.) Her notes from that day indicate that without medication, Bristol was much calmer in presentation, when compared to his presentation at the July visit, but that he sought medication to help him sleep. (Docket Item 61-1 at 8.) Olinger noted prescribing Bristol low evening doses of Remeron and Paxil and ordering another follow-up visit in 90 days or as needed. (Docket Item 61-1 at 8.)

In Bristol's response to Olinger's motion, he complains that she has not filed any "admissions," which he characterizes as a failure to present undisputed facts.

(Docket Item No. 71, at 1.) He also asserts that "reliable evidence such as July 21 2022 telemed has been tampered with." (Docket Item No. 71, at 1.) Bristol contends that at this appointment, his first encounter with Olinger, she diagnosed him with antisocial personality disorder, rather than with the diagnoses of generalized anxiety disorder and depression, made by his prior providers since he had started taking mental health medications. (Docket Item No. 71, at 2.) He faults Olinger for failing to have him restrained and monitored if she believed him to be a safety risk that day, and he complains that if she saw drug seeking tendencies, she should have provided him "further help mentally." (Docket Item No. 71, at 2.)

F.  Eighth Amendment Analysis

After careful review of the record, the court concludes that Olinger is entitled to summary judgment as to Bristol's deliberate indifference claim against her. At the most, he presents evidence or allegations showing his disagreement with Olinger's treatment decisions on July 21, 2022. It is undisputed that during that appointment, Bristol claimed his mental health medications were not working and wanted medication changes or additional medications. Olinger's declaration, signed under penalty of perjury, indicates her medical opinion that on that date, Bristol did not present with symptoms warranting several of the medications prescribed to him. In her medical judgment, she assessed him as engaging in drug-seeking and other behaviors that strongly supported his prior diagnosis with antisocial personality disorder and did not indicate symptoms of depression or anxiety. She made a professional decision to discontinue, or taper down and discontinue, most of his mental health medications, which had been prescribed to address symptoms of anxiety and depression.

Olinger did not deny Bristol mental health treatment, as he alleges, however. She ordered that two of the medications that needed to be tapered down before being discontinued should be administered in decreasing doses over two weeks or more. Bristol has claimed that he was not tapered down from these medications, but he has not provided any evidence that Olinger had any personal involvement in administering the medication in the dose changes she had prescribed.

Olinger did not immediately discontinue Buspar, since it is also indicated to address not only anxiety, but also agitation, which she observed Bristol exhibit during the July 21, 2022, session. Only after Bristol continued to refuse to consent to treatment after a month did Olinger also discontinue Buspar. Finally, when she assessed Bristol in November 2022, Olinger observed differing behaviors and reported symptoms. After assessing these differences, she prescribed evening doses of two anti-depressant medications to support Bristol's ability to sleep.

In short, this record does not support a finding that Olinger knew of a serious mental health need that she failed to treat. Rather, the record indicates that, in her medical judgment, Bristol's mental health fluctuates over time, and she adjusted his medications to address current symptoms. The court cannot second-guess such medical judgments, and an inmate's mere disagreement with such judgments does not prove the provider acted with deliberate indifference. *See Wright*, 766 F.2d at 849.

Bristol's response to N.P. Olinger's motion attempts to undermine the validity of Olinger's evidence, but his efforts are unavailing. He cites no authority requiring that a defendant support a summary judgment motion with admissions rather than a declaration signed under penalty of perjury and supported by medical records. His

claim that unspecified "reliable evidence" from the July 21, 2022, telemed session "has been tampered with" is entirely unsupported by factual allegations or evidence. (Docket Item No. 71, at 1.)  His mere assertion of tampering, without factual support, is insufficient to overcome Olinger's verified declaration at the summary judgment stage. *See Richardson v. Clarke*, 52 F.4th 614, 620 (4th Cir. November 7, 2022) ("[C]onclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.").  Bristol's primary complaints against Olinger's actions at and following the July 21, 2022, session express disagreement with her medical diagnoses and treatment decisions, essentially contending that they were somehow inadequate and unprofessional.  Such allegations present, at most, a claim of negligence, or in this context, medical malpractice.  Such claims are not cognizable under § 1983.  *See Estelle*, 429 U.S. at 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

For the reasons stated, the court concludes that Bristol fails to present any genuine issue of material fact on which he could persuade a factfinder to rule in his favor on his deliberate indifference claim against Olinger.  Therefore, the court finds that the defendant is entitled to summary judgment as a matter of law and will grant her motion.

## II.   Conclusion

For the reasons stated, the court will grant the defendant's summary judgment motion.  As to the retaliation claim, the court will grant summary judgment on the ground that Bristol failed to exhaust administrative remedies.  As to the deliberate indifference claim, however, the court will grant summary

judgment on the merits.  A separate Final Order will issue herewith dismissing all claims with prejudice.

An appropriate order will be entered.

**ENTERED:** February 28, 2025.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-17-